UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| RASHEED C. ECHOLS,<br><br>       Plaintiff,<br><br> v.<br><br>DAN STITES, *et al.*,<br><br>       Defendants. | Case No. C17-0262-RAJ-MAT<br><br>REPORT AND RECOMMENDATION |

INTRODUCTION AND SUMMARY CONCLUSION

Plaintiff Rasheed Echols is a former inmate at the Snohomish County Jail (SCJ) in Everett, Washington. He has filed an amended civil rights complaint under 42 U.S.C. § 1983 in which he alleges that his constitutional rights were violated when he was placed in non-voluntary protective custody at the SCJ on 23-hour lockdown. Plaintiff names SCJ Captain Dan Stites, SCJ Classification Supervisor Kimberly Parker, and SCJ Classification Specialists Tony Shedrick and Terry Bloss as defendants in his amended complaint. Defendants have now filed a motion for summary judgment. Plaintiff has been advised of the summary judgment requirements pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998), but has filed no response to defendants' summary judgment motion. The Court, having reviewed defendants' motion, and the balance of

REPORT AND RECOMMENDATION - 1

the record, concludes that defendants' motion for summary judgment should be granted, and plaintiff's amended complaint and this action should be dismissed with prejudice.

## FACTS

A.   Charges, Convictions, Release

Plaintiff was booked into the Snohomish County Jail on October 31, 2016 on charges of unlawful possession of payment instruments, possession of stolen property, possession of a controlled substance, possession of drug paraphernalia, obstructing a law enforcement officer, and driving with a suspended license. (*See* Dkt. 24 at 2, Ex. A.) These charges were originally filed in Everett District Court, and bail was set in the amount of $10,000. (*See id*. at 2, Ex. A, Ex. B.)

In November 2016, while in custody on the above charges, plaintiff was charged in Marysville Municipal Court with reckless endangerment – domestic violence, unlawful carrying or displaying a weapon with intent to intimidate – domestic violence, and obstructing a law enforcement officer. (*Id*. at 2, Ex. C.) Bail on these charges was set in the amount of $10,000 as well. (*Id*.) At around the same time, plaintiff was charged in Snohomish County District Court – Cascade Division with driving under the influence, reckless driving, and driving with a suspended license. (*See id*. at 2, Ex. D.) Bail on these charges was set in the amount of $5000.

On December 7, 2016, plaintiff was convicted on the charges filed against him in Marysville Municipal Court, and he was sentenced to 170 days in jail with credit for time served. (*Id*. at 3, Ex. E.) On March 17, 2017, plaintiff was convicted on the driving under the influence and driving with a suspended license charges filed against him in Cascade District Court, and he was sentenced to 45 days in jail, to run consecutively to all other holds. (*Id*. at 3, Ex. F.) On March 29, 2017, plaintiff was conditionally released on his personal recognizance on the charges still pending against him in Snohomish County Superior Court; *i.e.*, the charges originally filed in

REPORT AND RECOMMENDATION - 2

Everett District Court. (Dkt. 24 at 3, Ex. G.) On April 7, 2017, plaintiff was released from the SCJ, having completed the consecutive sentences out of the Marysville Municipal and Cascade District Courts. (*Id*. at 3.)

B.     SCJ Housing History

After being booked into the jail on October 31, 2016, plaintiff was initially housed in the medical unit to address medical issues identified during the booking process. (Dkt. 25 at 3.) On November 3, 2016, plaintiff was moved to the G1 module for intake and classification. (*Id*.) Based on plaintiff's offense history, and his performance in the jail during seven prior bookings, plaintiff was classified as a medium security inmate. (*Id*.) On November 3, 2016, plaintiff was moved to the F2 module, the medium security module. (*Id*.) After engaging in some bizarre behavior in F2, including dancing provocatively and causing disruption and conflict in the module, plaintiff was moved on November 11, 2016 to the F4 module, a high/medium security module. (*Id*.)

On the evening of November 21, 2016, plaintiff was assaulted by another inmate in F4. (*See* Dkt. 21 at 6, 8.) The day after the assault, Custody Deputy (C/D) Lance Kenyon advised Classification Specialist Charles Mitchell that there remained some lingering tension in the unit. (*See* Dkt 22 at 2; Dkt. 25, Ex. B at 3.) Later on the evening of November 22, 2016, C/D Kenyon contacted Mr. Mitchell and asked that he return to F4. (*See id*.) When Mr. Mitchell arrived, C/D Kenyon showed him an anonymous kite that had come from within the F4 module, warning that "the Mexican in 31 house & 17 House is (sic) planeing (sic) to Fight the Black guy In 5 house. They made the whight (sic) guy fight him yesterday." (*See* Dkt. 22 at 2; Dkt. 25, Ex. A.)

Mr. Mitchell thereafter decided to move plaintiff out of F4, at least temporarily, given the anonymous threat, the assault on plaintiff the previous day, and C/D Kenyon's representation that noticeable tension remained in the module. (Dkt. 22 at 2.) Upon reviewing plaintiff's housing

REPORT AND RECOMMENDATION - 3

history, including his classification as a medium security inmate, his recent removal from the F2 module due to behavioral issues, and the fact that plaintiff was to be housed alone due to a medical issue, Mr. Mitchell decided to have plaintiff moved to the F1 module as a "house alone," at least until the F Floor classification specialist could follow up. (*Id*. at 3.)

Tony Shedrick, the F Floor classification specialist, spoke with plaintiff while he was housed in F1 in an effort to understand what had precipitated plaintiff's problems in F2 and F4. (Dkt. 25 at 4.) Plaintiff informed Mr. Shedrick that he was owed some commissary in F2, but on the evening commissary goods were to be delivered he was moved out of the module. (*Id*.) Plaintiff believed he had been "kited out," meaning that one or more inmates had written something in a kite to get plaintiff moved out of the module. (*Id*.) Though plaintiff was actually moved out of F2 for behavioral reasons, plaintiff's mistaken belief that he had been "kited out" caused him to yell at some Sureno gang members as he was leaving the unit, "I hope you all piss dirty." (*Id*.) Plaintiff's statement was apparently intended to alert custody staff that the Surenos possessed contraband and were doing drugs in the module. (*Id*.)

Mr. Shedrick learned from a member of the Sureno gang that a directive had been given from "the top" to spread the word that plaintiff had snitched-out the Sureno gang. (*See id*. at 4.) Mr. Shedrick also learned that a hit may have been placed on plaintiff. (*See id*.) According to Mr. Shedrick, this explained the November 21, 2016 assault on plaintiff and the anonymous kite that was received the following day by C/D Kenyon in the F4 module. (*Id*.) Because there were significant numbers of Surenos housed in the F1, F2, and F4 modules, and because plaintiff could not be housed in the general population/minimum security modules given his medium security classification, Mr. Shedrick determined that the only safe place for plaintiff was in a maximum security unit, in protective custody. (Dkt. 25 at 5.)

REPORT AND RECOMMENDATION - 4

On November 29, 2016, Mr. Shedrick made the decision to place plaintiff in the 4 North maximum security module (4N) for his own protection until the classification committee could review his housing assignment and determine whether there were other safe alternatives. (*Id*.) The classification committee met the following day and, after reviewing plaintiff's case, determined that there were no better housing options that would ensure plaintiff's safety. (*Id*.; Dkt. 20 at 4.)

The maximum security modules are used to house inmates who cannot peaceably cohabitate with other inmates in a less restrictive environment, and to facilitate "keep separate" inmates when there are no other appropriate housing options available. (Dkt. 20 at 3.) Some inmates are housed in maximum security at their own request, some are sent there for disciplinary reasons, and some are there for protection from other inmates. (*Id*.) As noted above, plaintiff was assigned to 4 North to protect him from the Sureno gang, which is the largest and most influential gang in the Snohomish County Jail. (Dkt. 26 at 6.)

The classification committee reviewed plaintiff's protective custody housing assignment on December 7th, 21st and 28th, January 4th and 11th, and February 8th. (Dkt. 20 at 4.) On each occasion the committee reviewed the evolving population dynamics in F1 and F4 (the two units most appropriate for plaintiff's security classification), in particular the presence of Sureno gang members generally, and the absence of certain Sureno gang members specifically. (Dkt. 26 at 7.) On each occasion, the committee determined that the number of gang members in the two units who knew, or likely knew, of the hit placed on plaintiff was too high to risk returning plaintiff to the F Floor. (Dkt. 26 at 7. *See also*, Dkt. 20 at 4.) Though security concerns were the primary focus of the committee's decision to keep plaintiff in protective custody, plaintiff's own behavior militated against reassigning him to a less restrictive housing unit. (Dkt. 20 at 4.) While in maximum security, plaintiff would rile and upset some of the more vulnerable inmates, he tested

REPORT AND RECOMMENDATION - 5

positive for methamphetamine, and he engaged in derogatory treatment towards staff.  (*Id*.)

Terry Bloss, the classification specialist assigned to the maximum security modules on 4 North at times relevant to this action, frequently interacted with plaintiff and discussed his housing assignment while he was confined in 4 North. (*Id*. at 3.)  Plaintiff was unhappy with the amount of time spent in lockdown and the associated restrictions on recreation time out of his cell.  (*Id*. at 4.)  Ms. Bloss repeatedly explained to plaintiff that because of the target on his back, and the absence of other housing options given plaintiff's own security restrictions, there were no other alternatives until the number of Surenos in the F Floor modules changed.  (*Id*. at 4-5.)  On February 15, 2017, a majority of the classification committee agreed that the population dynamic in the F Floor modules had changed enough to permit plaintiff to be removed from protective custody.  (*Id*. at 5.)  Plaintiff was reassigned to F4 where he remained until he was released from custody on April 7, 2017.  (*Id*.)

DISCUSSION

Plaintiff asserts in his amended complaint that defendants violated his due process rights when they kept him confined in a maximum security unit, on 23-hour lockdown, on non-voluntary protective custody status.[1]  (*See* Dkt. 9 at 3-4.)  Plaintiff also appears to complain that defendants didn't respond to his concerns about being confined in the maximum security unit, and that he was not consistently advised of the classification committee's decisions. (Dkt. 9 at 3.)

---

[1] On October 11, 2017, about five and a half months after plaintiff submitted his amended complaint (Dkt. 9), plaintiff submitted a document which he identified as "Clarity of Civil Rights Complaint" (Dkt. 16).  Defendants, in their motion for summary judgment, move to strike that document, to the extent it might be deemed a second amended complaint, because the pleading is untimely and plaintiff did not properly request leave to amend.  (*See* Dkt. 19 at 16.)  The Court agrees that plaintiff's attempt to clarify his complaint is not properly before the Court.  The Court notes as well that the document does not, in fact, serve to clarify the amended complaint which was sufficiently clear to permit defendants to effectively respond to that pleading.  Plaintiff's "Clarity of Civil Rights Complaint" (Dkt. 16) is therefore STRICKEN.

REPORT AND RECOMMENDATION - 6

Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require

REPORT AND RECOMMENDATION - 7

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

## Section 1983 Standard

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

## Due Process

From November 29, 2016, when plaintiff was first assigned to the maximum security unit, until December 7, 2016, when plaintiff was convicted on the charges filed against him in Marysville Municipal Court, plaintiff was a pretrial detainee at SCJ. When a pretrial detainee challenges some aspect of his pretrial detention that is not alleged to violate any express guarantee

REPORT AND RECOMMENDATION - 8

of the Constitution, the issue to be decided is the detainee's right to be free from punishment. *Bell v. Wolfish*, 441 U.S. 520, 533 (1979). Such challenges arise under the Fourteenth Amendment Due Process Clause. *Id*. at 535.

While the Due Process Clause protects pretrial detainees from punishment, not every disability imposed during pretrial detention constitutes "punishment" in the constitutional sense. *Id*. at 537. Thus, the test to be applied in determining whether particular restrictions and conditions imposed as a result of pretrial detention amount to punishment in the constitutional sense is whether there was an express intent to punish, or "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. *Id*. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963).

The Supreme Court has recognized that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id*. at 546. The Supreme Court has further recognized that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id*. at 547.

The record makes clear that plaintiff was transferred to the maximum security unit when classification staff learned that a hit had apparently been placed on plaintiff by the Sureno gang after plaintiff snitched-out gang members as he was leaving the F2 module on November 11, 2016. Defendants' concern that plaintiff's safety was at risk was reinforced by the fact that plaintiff was assaulted in the F4 module on November 21, 2016, and that an anonymous kite was submitted on

REPORT AND RECOMMENDATION - 9

November 22, 2016 warning that more violence against plaintiff had been planned. Plaintiff was thereafter kept in the maximum security unit on protective custody status because of the prevalence of Sureno gang members in the other housing units to which plaintiff could have been assigned given his own security classification, and that plaintiff remained there only until there was a sufficient change in the gang population in the other appropriate housing units to reduce the risk to plaintiff's safety.

While plaintiff's assignment to the maximum security module on protective custody status resulted in more restrictive conditions of confinement than plaintiff might otherwise have experienced, the evidence in the record supports the conclusion that plaintiff's placement and retention in the maximum security unit was not intended to punish plaintiff and was, indeed, reasonably related to legitimate government objectives; *i.e.*, ensuring plaintiff's safety and maintaining institutional security. Plaintiff fails to establish any due process violation arising out of his assignment to the maximum security module while he was a pretrial detainee.

Though a different standard applies to plaintiff's due process claim for the period of time he was confined in the maximum security module following his conviction in Marysville Municipal Court on December 7, 2016, plaintiff likewise fails to establish any violation of his due process rights relating to that period of confinement. The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of law. The procedural guarantees of the Fourteenth Amendment's Due Process Clause apply only when a constitutionally protected liberty interest is at stake. *Ingraham v. Wright*, 430 U.S. 651, 672 (1977). It is well established that a prisoner does not have a liberty interest in a particular classification status. *Hernandez v. Johnston*, 833 F.2d 1316, 1318 (9th Cir. 1987) (citing *Moody v. Daggett*, 429 U.S. 78 (1976)). Likewise, prisoners have "no liberty interest in freedom from

REPORT AND RECOMMENDATION - 10

state action taken within the sentence imposed," unless such action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

The Ninth Circuit has previously found that "administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence." *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (citing *Toussaint v. McCarthy*, 801 F.2d 1080, 1091-92 (9th Cir. 1986)). Nothing in the record suggests that plaintiff's post-conviction restraint in the maximum security module, a module which appears to be the functional equivalent of a typical administrative segregation unit, constituted an atypical and significant hardship. Because plaintiff had no liberty interest in his classification status or in his placement in the maximum security unit, plaintiff cannot prevail on his due process challenge to his post-conviction restraint in the maximum security module.

As noted above, plaintiff also appears to complain that defendants didn't respond to his concerns about being confined in the more restrictive maximum security unit, and that he was not consistently advised of the classification committee's decisions. The evidence in the record demonstrates that plaintiff had opportunities to challenge his placement in the maximum security module through the grievance process, and that plaintiff's grievances, and related appeals, were consistently rejected based on concerns for his safety. (*See* Dkt. 23 at 4-6.) The fact that plaintiff did not like the responses he received to his grievances and appeals does establish any violation of a protected right.

With respect to the classification committee's decisions, plaintiff complains only that "some weeks I would hear nothing from classification." (Dkt. 9 at 3.) The record demonstrates that while the classification committee reviewed plaintiff's classification status regularly, it did not do so on a weekly basis. (*See* Dkt. 20 at 4; Dkt. 23 at 3; Dkt. 26 at 7.) According to Ms. Bloss,

REPORT AND RECOMMENDATION - 11

letters detailing the classification committee's decisions are typically delivered to inmates on the same day the decision is made. (Dkt. 20 at 4.) As the committee did not review plaintiff's classification status each week during the period of time plaintiff was assigned to protective custody, and was not, in fact, required to do so, plaintiff would not have heard from classification every week. Plaintiff fails to establish any violation of a protected right arising out of the classification committee's notification practices.

Defendants' evidence establishes that plaintiff's placement in the maximum security module on protective custody status was consistent with constitutional principles, and plaintiff makes no effort to rebut that evidence. Accordingly, defendants are entitled to summary judgment.

## CONCLUSION

Based on the foregoing, this Court recommends that defendants' motion for summary judgment be granted, and that plaintiff's amended complaint and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect the right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **March 16, 2018**.

DATED this 16th day of February, 2018.

_[signature]_
Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 12